# United States District Court

## NORTHERN DISTRICT OF INDIANA

**FILED**
SEP 0 9 2005

PAUL R. CHERRY
UNITED STATES MAGISTRATE
U.S. DISTRICT COURT
NORTH DISTRICT OF INDIANA

UNITED STATES OF AMERICA
v.

RUDOLFO HEREDIA
324 EAST 138TH STREET
RIVERDALE, ILLINOIS

**CRIMINAL COMPLAINT**

CASE NO. 2:05MJ189

I, Special Agent JOEL STEPHEN, with the Federal Bureau of Investigation, and undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about the first or second week of April 2005, in Lake County, in the Northern District of Indiana defendant(s) did;

Travel from Illinois to Indiana with the intent to kill, injure harass, or intimidate another person, and in the course of, or as a result of said travel, placed that person in reasonable fear of death or serious bodily injury

in violation of Title 18 United States Code Section 2261A.

I further state that I am a(n) Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof.      ( X ) Yes      ( ) No

_____
Signature of Complainant
Special Agent JOEL STEPHEN

Sworn to before me, and subscribed in my presence

September 9, 2005 _____ at the ___NORTHERN DISTRICT OF INDIANA___
Date                                                                                          City and State

PAUL R. CHERRY                                                        S/Paul R. Cherry
UNITED STATES MAGISTRATE JUDGE                 _____
Name and Title of Judicial Officer                                Signature of Judicial Officer
AUSA PHILIP C. BENSON

# AFFIDAVIT

Joel A. Stephen, Special Agent, Federal Bureau of Investigation, being duly sworn under oath states as follows:

1. I am a Special Agent with the Federal Bureau of Investigation and have been so employed since February of 2004. In connection with my official duties, I investigate violations of all types of federal criminal law.

2. This affidavit is submitted for the limited purpose of establishing probable cause in support of the attached complaint, and therefore contains only a summary of the relevant facts. I have not included each and every fact known by me concerning the individuals and offenses described herein. The information in this affidavit is based on my firsthand knowledge, and information provided by other law enforcement officers and witnesses.

3. On September 2, 2005, the Hammond, Indiana Police Department requested assistance from the Federal Bureau of Investigation with the investigation of the murder of Alexandra Anaya, age 13. Alexandra Anaya had last been seen at her residence in Hammond, Indiana on August 13, 2005.

4. On August 16, 2005, a decapitated and dismembered body was found in a river in Chicago, Illinois approximately 1 1/2 blocks from Heredia's residence. On September 2, 2005, DNA results confirmed that the decapitated and dismembered body found in the river was in fact Alexandra Anaya. Preliminary coroner results indicate that Alexandra Anaya had been sexually assaulted.

5. Sandra Anaya, mother of Alexandra Anaya (deceased), began dating Rodolfo Heredia, aka Rudy, in September of 1996. Sandra Anaya and Heredia have twin daughters

1

together and lived together on and off through 2003. Heredia is not the biological father of Alexandra Anaya. Anaya and Heredia ended their relationship in the spring of 2005 after Alexandra Anaya told her mother (Sandra Anaya) that Heredia had been sexually molesting her since age 7.

6. On August 13, 2005, at approximately 3 am, Sandra Anaya was at a tavern in East Chicago, Indiana. Phone records revealed that Anaya received three calls on her cellular telephone from Rodolfo Heredia's home telephone number (773-785-7460). Anaya did not answer these telephone calls as she wanted to end all contact with Heredia. At approximately 3:30 a.m., Anaya returned to her residence at 4815 Pine Street, Hammond, Indiana. Upon arrival at her residence, Alexandra Anaya told her mother (Sandra Anaya) that Rodolfo had called Anaya's residence looking for her (Sandra Anaya). Alexandra Anaya told Rodolfo that her mother was not home.

7. After speaking with Alexandra, Sandra Anaya left the residence and did not return until approximately 6:30 A.M. Other adults remained in the residence while Sandra Anaya left.

8. Pursuant to a federal grand jury subpoena, incoming and outgoing call activity records were received for Rodolfo Heredia's home telephone number telephone number (773) 785-7460 for the time period of August 12, 2005 through August 14, 2005. The phone records revealed the following call information;

```
08/13/2005    02:54:54 call from (773) 785-7460 to Anaya's cell phone
08/13/2005    02:55:14 call from (773) 785-7460 to Anaya's residence
08/13/2005    02:55:26 call from (773) 785-7460 to Anaya's residence
08/13/2005    02:58:18 call from (773) 785-7460 to Anaya's cell phone
08/13/2005    02:58:27 call from (773) 785-7460 to Anaya's cell phone
```

9. On September 7, 2005, FBI Agents and other investigators established a physical surveillance at Heredia's residence, located at 324 East 138th, Riverdale, Illinois. At approximately 7 am, Heredia was observed departing 324 East 138th, Riverdale, Illinois, and was followed to his place of employment in Blue Island, Illinois. Heredia was later taken into custody by the Chicago Police Department at his Blue Island, Illinois place of employment.

10. On September 7, 2005, a search warrant was executed at 324 East 138th, Riverdale, Illinois. Documents recovered during the search warrant and interviews of neighbors confirmed that 324 East 138th, Riverdale, Illinois was Heredia's residence.

11. An interview was conducted of Sandra Anaya by Special Agents of the FBI and Detectives with Chicago, Illinois Police Department and the Hammond, Indiana Police Department about her relationship with Rodolfo Heredia. Anaya described Heredia as someone who is violent after drinking alcohol. On two to three occasions during Anaya's relationship with Heredia, Heredia threatened to "kill" her if she ended the relationship. After the relationship ended, Heredia told Anaya that "I'm not taking no for an answer. You will never leave me. You are mine." Anaya went on to say that Heredia would not let her "go on with" her life.

12. During this interview, Anaya described several acts of violence by Heredia toward others, including a July 2005 incident during which Heredia stabbed his brother in law. Heredia came to Anaya's residence covered in blood following this incident. Heredia told Anaya that he stabbed his brother in-law because his brother in-law was laughing at him.

3

Heredia told Anaya that he had a gun during this incident. (A Chicago Police Department report for this incident also states that Heredia had a knife and a "small caliber handgun" during this incident.) Anaya said that both she and her daughter were afraid of Heredia. Anaya went on to say that when Heredia does something "violent", it "doesn't bother him. He doesn't care and has no regret for his actions."

13. According to Sandra Anaya, her and Heredia broke up in late March or early April of 2005. Following her break-up with Rodolfo Heredia, Heredia began stalking Anaya at her residence located at 4815 Pine Street in Hammond, Indiana and at her place of employment in Hammond, Indiana. According to Anaya, Heredia was living in Riverdale, Illinois at this time.

14. Shortly after this break-up, Heredia's sister Norma Heredia phoned Anaya and told her that Rodolfo Heredia was "standing on the corner watching" her house. Norma Heredia went on to tell Anaya "not to bring guys around, you know how he is." A neighbor of Anaya's also observed Rudolfo Heredia watching Anaya's residence on this same day.

15. In early April 2005, Alexandra Anaya told her mother, Sandra Anaya, the she observed Heredia standing on the roof of a neighboring structure, during a rain storm, at approximately 6 A.M., looking toward Anaya's bedroom window. Anaya also said that shortly following her break-up with Heredia, she came home and was met by her landlord, who said "I just saw your husband leaving" your house. Anaya did not believe that Heredia had a key to her residence and after this incident she had the locks changed.

16.  Anaya also described an incident in early April 2005, where, after Heredia broke into her residence, Heredia came to her place of employment and confronted her (Anaya)

4

about used condoms that he (Heredia) had found in Anaya's residence. Heredia admitted to Anaya that he found the condoms inside Anaya's residence. Anaya had not given Heredia permission to enter her house. Heredia became verbally abusive toward Anaya during this confrontation.

17. Anaya stated during the interview, that based upon Heredia's conduct towards her and his violent temper, that she felt Heredia was threatening her and she was in fear of death or serious bodily injury from Heredia.

18. On September 7, 2005, Heredia was interviewed by Detectives with the Chicago, Illinois Police Department after Heredia waived his Miranda Rights and agreed to speak with Detectives without an attorney present. Heredia identified 324 East 138th, Riverdale, Illinois as his residence. During the interview, Heredia admitted that he had been following and watching Sandra Anaya and Alexandra Anaya at their residence in Hammond, Indiana, since his (Heredia) relationship with Sandra Anaya ended in the spring of 2005. Specifically, Heredia admitted climbing onto the roof of Anaya's Hammond, Indiana residence and looking into the window. Heredia also admitted going to Anaya's "job" and residence, both of which were in Hammond, Indiana, and "watching" her (Anaya). Heredia also said that Alexandra Anaya saw him (Heredia) watching her (Alexandra Anaya). Heredia said that during April of 2005, without Anaya's permission, he made a copy of the key to Anaya's Hammond, Indiana residence. Heredia went to Anaya's Hammond, Indiana residence and entered the residence when he (Heredia) knew that she (Anaya) was not home. When Anaya confronted Heredia about being inside her Hammond, Indiana residence, he (Heredia) told Anaya that he had found

the door unlocked. Heredia further admitted to taking used condoms from Anaya's residence and bringing those to Anaya's workplace and repeatedly questioning Anaya as to who she was involved with. Based upon Heredia's conduct towards her and his violent temper, Anaya believed that Heredia was threatening her and she was in fear of death or serious bodily injury from Heredia.

19. Based on the information contained herein, your affiant believes that Rodolfo Heredia travel in interstate commerce for the purpose of killing, injuring, harassing, or intimidating Sandra Anaya and Alexandra Anaya, and that Sandra Anaya and Alexandra Anaya were in reasonable fear of death or serious bodily injury by Heredia, in Violation of Title 18, United States Code, Section 2261A, Interstate Stalking

FURTHER YOUR AFFIANT SAYETH NOT

Joel A. Stephen
Special Agent - Federal Bureau of Investigation

Subscribed and Sworn to me before this 9th day of September 2005.

S/Paul R. Cherry
Paul R. Cherry
United States Magistrate Judge

6